DEBORAH CONNOR, Acting Chief
Money Laundering and Asset Recovery Section (MLARS)
MARY BUTLER
Chief, International Unit
WOO S. LEE
Deputy Chief, International Unit
JONATHAN BAUM, Trial Attorney
BARBARA LEVY, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone: (202) 514-1263
Email: Woo.Lee@usdoj.gov
SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (CBN: 274184)
JONATHAN GALATZAN (CBN: 190414)
Assistant United States Attorneys
Asset Forfeiture Section
312 North Spring Street, 14th Floor
Los Angeles, California 90012
Telephone: (213) 894-3391/(213) 894-2727
Facsimile: (213) 894-7177
Email: John.Kucera@usdoj.gov
Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ONE PEN AND INK DRAWING BY VINCENT VAN GOGH, ETC., ET AL.,<br><br>Defendant. | NO. CV 16-05366-DSF (PLAx)<br><br>PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOHN J. KUCERA<br><br>DATE: October 2, 2017<br>TIME: 1:30 p.m.<br>Before the Hon. Dale S. Fischer, United States District Judge |

PLEASE TAKE NOTICE that on October 2, 2017, at 1:30 p.m., plaintiff United States of America ("the government" or "plaintiff") will present a Motion for the Entry of Default Judgment against the interests of all potential claimants to the defendant assets, before the Honorable Dale S. Fischer, United States District Court, Courtroom 7D, United States Courthouse, 350 West 1st Street, Los Angeles, California 90012.

The motion is brought pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and Rule 55-1 of the Local Rules of Practice for the Central District of California. The motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and Declaration of John J. Kucera, other facts appearing in the court's file, and such further evidence, oral or

///

///

documentary, as may be presented prior to or at the hearing on this motion.

Dated: August 30, 2017

Respectfully submitted,

DEBORAH CONNOR
Acting Chief, MLARS

SANDRA R. BROWN
Acting United States Attorney

*/s/John J. Kucera*
JOHN J. KUCERA
JONATHAN GALATZAN
Assistant United States Attorneys

WOO S. LEE
Deputy Chief, MLARS
JONATHAN BAUM
BARBARA LEVY
Trial Attorneys, MLARS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION PAGE

TABLE OF AUTHORITIES....ii

MEMORANDUM OF POINTS AND AUTHORITIES....1

I. THE POTENTIAL CLAIMANTS ARE IN DEFAULT....1

Execution of Service....2

Notice to Tan Kim Loong....3

Notice to Low Taek Jho....4

Notice to Jynwel Capital Ltd....5

Notice to Tanore Finance Corporation....5

Notice to Davide Nahmad....6

II. ARGUMENT....8

A. THE STANDARD FOR ENTRY OF JUDGMENT BY DEFAULT....8

1. THE EITEL FACTORS....8

2. PROCEDURAL REQUIREMENTS....10

3. FAILURE TO FILE A VALID CLAIM AND ANSWER....11

B. THE FACTS DEEMED ADMITTED BY THE FAILURE TO FILE A CLAIM OR ANSWER ESTABLISH THAT THE DEFAULT DEFENDANT ASSETS ARE FORFEITABLE....12

1. The Van Gogh....12

2. Monet’s SGM....16

3. The Defendant Euros....18

C. THE LEGAL BASES FOR FORFEITURE OF THE DEFAULT DEFENDANT ASSETS....21

D. THE PROPOSED DEFAULT JUDGMENT....23

III. CONCLUSION....23

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

**FEDERAL CASES**

*Eitel v. McCool*, 782 F.2d 1470, (9th Cir. 1986)....8

*Geddes v. United Fin. Group*, 559 F.2d 557 (9th Cir. 1977)....9

*PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431 (C.D. Cal. 1999)....8

*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987)....9

*U.S. v. $11,918.00*, 2007 WL 3037307 (E.D. Cal. Oct. 17, 2007)....11

*United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268 (10th Cir. 2008)....11

*United States v. $291,828.00 In U.S. Currency*, 536 F.3d 1234 (11th Cir. 2008)....23

*United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491 (6th Cir. 1998)....11

*United States v. 2007 Chrysler 300 Touring*, Slip Op, 2011 WL 1119701, (D.N.M. Mar. 10, 2011)....11

*United States v. Approximately $194,752 in U.S. Currency*, Slip Op, 2011 WL 3652509 *3 (N.D. Cal. Aug. 19, 2011)....9

*United States v. Currency, U.S. $42,500.00*, 283 F.3d 977 (9th Cir. 2002)....23

*United States v. One 1985 Cadillac Seville*, 866 F.2d 1142 (9th Cir. 1989)....11

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 981(a)(1)(A)....1, 10, 22

18 U.S.C. § 981(a)(1)(C)....1, 9, 22

18 U.S.C. § 983(c)(1)....22

18 U.S.C. § 1343....9

18 U.S.C. § 1956(a)(1)(B)(i)....10, 21, 22

18 U.S.C. § 1956(a)(2)(B)....22

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION PAGE


18 U.S.C. § 1956(c)(7)(A) .......... 9

18 U.S.C. § 1956(c)(7)(B)(iii) .......... 9

18 U.S.C. § 1956(c)(7)(B)(iv) .......... 9

18 U.S.C. § 1956(c)(7)(D) .......... 9

18 U.S.C. § 1956(h) .......... 10, 21, 22

18 U.S.C. § 1957 .......... 21

18 U.S.C. § 2314 .......... 9

18 U.S.C. § 2315 .......... 9

Fed. R. Civ. P. 55(a) .......... 8

Fed. R. Civ. P. 55(b)(2) .......... 8, 11

Servicemembers Civil Relief Act 2003 .......... 8, 11

Local Rule 5.2-1 .......... 4

Local Rule 55 .......... 11

Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Action

Rule G(3)(c)(iv) .......... 2

Rule G(4)(a)(iv)(C) .......... 3

Rule G(5) .......... 7


**OTHER AUTHORITIES**


10A Wright, Miller & Kane, *Federal Practice and Procedure 3d* § 2688 .......... 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. THE POTENTIAL CLAIMANTS ARE IN DEFAULT

On July 20, 2016, the government initiated this action by filing a verified complaint against three defendant assets: one pen and ink drawing by Vincent Van Gogh titled "La maison de Vincent a Arles" (the "Van Gogh")[1]; one painting by Claude Monet titled "Saint-Georges Majeur" ("Monet's SGM"); and one painting by Claude Monet titled "Nympheas avec Reflets de Hautes Herbes" ("Monet's Nympheas") (collectively, the "original defendant assets"). *See* Decl. of John J. Kucera ("Kucera Dec.") at ¶ 2.

On August 8 2016, the government filed a First Amended Verified Complaint for Forfeiture *in Rem* against the original defendant assets and one additional defendant asset, 25,227,025.83 Euros held in an escrow account at UBS, S.A. in Switzerland constituting the proceeds of the sale of a painting by Claude Monet titled "Nympheas" (the "Petit Nympheas Painting") ("defendant Euros"), (collectively, "the FAC defendants") pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) ("FAC"). *Id*. at ¶ 3.

At the time of the filing of the verified complaint and the FAC, the FAC defendants were located in (or, in the case of the defendant Euros, in the process of being transferred to) Switzerland. On August 9, 2016, warrants for arrest *in rem* were issued for the FAC defendants. (See Dkts. #16, #17, and #19). On October 13, 2016,

---

[1] The Complaint and FAC contained a typographical error with respect to the dimensions of the Van Gogh, erroneously stating the dimensions as 76 cm x 54 cm *See* Complaint at ¶ 435, FAC at ¶ 435. The correct dimensions of the Van Gogh are 13.4 x 20.6 cm. The error is immaterial as there is no other known Van Gogh work titled "La maison de Vincent a Arles," either in the erroneously-stated dimensions or otherwise.

copies of the complaint, notice, and each of the arrest warrants in rem were transmitted to the appropriate Swiss authority for serving process, the Central Authority of Switzerland, pursuant to the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters ("MLAT"). Pursuant to the MLAT, the United States requested that the FAC defendants be restrained as a preliminary step to forfeiture under U.S. law. The MLAT further requested that the FAC and warrant be served on Moebel-Transport AG (the custodian of the Van Gogh and Monet's SGM); UBS AG (a co-custodian of the defendant Euros); and Escrow Agent Guillaume Tattevin for the Escrow Account Number 0240-504032.60D (a co-custodian of the defendant Euros). *Id*. at ¶ 4.

The transmittal of the warrants satisfied the requirements for execution of process against the FAC defendants pursuant to Rule G(3)(c)(iv) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Action (the "Supplemental Rules"), providing that execution of process on property outside the United States may be accomplished by transmitting the warrant "to an appropriate authority for serving process where the property is located." *Id*. at ¶ 5.

<u>Execution of Service</u>

True and correct copies of the request to Moebel-Transport AG for the confiscation of the Van Gogh and Monet's SGM, an English translation of the request, and the certification of translation are attached to the Kucera Dec. as Exhibit "A." True and correct copies of the acknowledgment of receipt of the request from Möbel-Transport

/ / /

/ / /

AG, an English translation of the acknowledgment, and the certification of translation are attached to the Kucera Dec. as Exhibit "B." *Id*. at ¶ 6.

True and correct copies of the request to Mr. Guillaume Tattevin for the confiscation of the defendant Euros, an English translation of the request, and the certification of translation are attached to the Kucera Dec. as Exhibit "C." True and correct copies of the confirmation of receipt of the request from Guillaume Tattevin, an English translation of the confirmation, and the certification of translation are attached to the Kucera Dec. as Exhibit "D." True and correct copies of the request to UBS Switzerland SA for the confiscation of the defendant Euros, an English translation, and the certification of translation are attached to the Kucera Dec. as Exhibit "E." True and correct copies of the confirmation of receipt of the request from UBS Switzerland AG, an English translation of the confirmation, and the certification of translation are attached to the Kucera Dec. as Exhibit "F." *Id*. at ¶ 7.

Beginning on September 12, 2016, Notice of Civil Forfeiture was posted on an official government internet site (www.forfeiture.gov) for at least 30 consecutive days, as required by Rule G(4)(a)(iv)(C) of the Supplemental Rules. Attached to the Kucera Dec. as Exhibit "G" is a true and correct copy of the internet Proof of Publication. *Id*. at ¶ 8.

<u>Notice to Tan Kim Loong</u>

On September 1, 2016, the government sent notice of this action to potential claimant Tan Kim Loong ("Loong") at the following last known address:

a. Kuala Lumpur, Malaysia 5200.[2]

The notice was sent by registered mail with a claim letter describing the FAC defendants and giving notice as to the time within which a claim and answer were required to be filed. A copy of the FAC was also provided. The registered mail sent to Loong at the Kuala Lumpaur, Malaysia 5200 address was returned and marked "Unclaimed." Attached to the Kucera Dec. as Exhibit "H" is a true and correct copy of the claim letter and the returned envelope. The government is unaware of, and has been unable to locate, any other address for Loong. *Id.* at ¶ 9.

Notice to Low Taek Jho

On September 1, 2016, the government sent notice of this action to potential claimant Low Taek Jho ("Jho") at the following last known addresses:

b. Singapore 239811; and

c. Hong Kong.

The notices were sent by registered mail with a claim letter describing the FAC defendants and giving notice as to the time within which a claim and answer were required to be filed. A copy of the FAC was also provided. The United States Postal Service registered mail return receipt for Jho at the Singapore 239811 address indicates that the claim letter was received and accepted. Attached to the Kucera Dec. as Exhibit "I" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. The United States Postal Service registered mail return receipt for Jho at the Hong Kong address indicates that the claim

[2] Pursuant to Local Rule 5.2-1, residential addresses have been omitted from this Motion.

letter was received and accepted. Attached to the Kucera Dec. as Exhibit "J" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. *Id.* at ¶ 10.

Notice to Jynwel Capital Ltd.

On September 1, 2016, the government sent notice of this action to potential claimant Jynwel Capital Ltd. ("Jynwel") at the following last known addresses:

a. 19/F, 50 Connaught Road Central, Hong Kong; and

b. Baker McKenzie Nominees Limited, Room 1401, Hutchison House, 10 Harcourt Road, Hong Kong.

The notices were sent by registered mail with a claim letter describing the FAC defendants and giving notice as to the time within which a claim and answer were required to be filed. A Copy of the FAC was also provided. The United States Postal Service registered mail return receipt for Jynwel at 19/F, 50 Connaught Road Central, Hong Kong, indicates that the claim letter was received and accepted. Attached to the Kucera Dec. as Exhibit "K" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. The United States Postal Service registered mail return receipt for Jynwel at Baker McKenzie Nominees Limited, Room 1401, Hutchison House, 10 Harcourt Road, Hong Kong, indicates that the claim letter was received and accepted. Attached to the Kucera Dec. as Exhibit "L" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. *Id.* at ¶ 11.

Notice to Tanore Finance Corporation

On September 1, 2016, the government sent notice of this action

to potential claimant Tanore Finance Corporation ("Tanore") at the following last known address:

a. Trident Chambers, PO Box 146, Road Town, Tortola, British Virgin Islands.

The notice was sent by registered mail with a claim letter describing the FAC defendants and giving notice as to the time within which a claim and answer were required to be filed. A Copy of the FAC was also provided. The United States Postal Service certified mail return receipt for Tanore at PO Box 146, Road Town, Tortola, British Virgin Islands, indicates that the claim letter was received and accepted. Attached to the Kucera Dec. as Exhibit "M" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. *Id*. at ¶ 12.

<u>Notice to Davide Nahmad</u>

On September 1, 2016, the government sent notice of this action to potential claimant Davide Nahmad ("Nahmad") at the following last known address:

a. Monaco 98000.

Notice was sent by registered mail with a claim letter describing the FAC defendants and giving notice as to the time within which a claim and answer were required to be filed. A Copy of the FAC was also provided. The United States Postal Service registered mail return receipt for Nahmad at the Monaco 98000 address indicates that the claim letter was received and accepted. Attached to the Kucera Dec. as Exhibit "N" is a true and correct copy of the claim letter and copy of the United States Postal Service return receipt card. *Id*. at ¶ 13. Nahmad filed a claim to the FAC on October 19, 2016, but claimed only Monet's Nympheas. No other claims were filed with

respect to Monet's Nympheas. *Id*. at ¶ 13.

In accordance with Supplemental Rule G(5), the time for known potential claimants Loong, Jho, Jynwel, Tanore, and Nahmad to file a claim in this action to the Van Gogh, Monet's SGM and the defendant Euros expired on October 6, 2016, and the time for filing an answer with respect to those three defendant assets expired on October 27, 2016. *Id*. at ¶ 14.

On May 26, 2017, Monet's Nympheas was dismissed from the action pursuant to an agreement between the government and Nahmad, the sole claimant in the case. That dismissal resolved Nahmad's claim in its entirety and left three defendant assets: the Van Gogh; Monet's SGM; and the defendant Euros (collectively, the "default defendant assets"). *Id*. at ¶ 14.

In accordance with Supplemental Rule G(5), all interested parties who did not receive direct notice were required to file a claim no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, and an answer within 21 days thereafter. The first day of publication of notice of this action on the government forfeiture site was September 12, 2016. Accordingly, the time to file a claim and answer for all interested parties who did not receive direct notice expired on November 11, 2016, and December 2, 2016, respectively. *Id*. at ¶ 15.

On May 30, 2017, a Default by Clerk was entered against Tan Kim Loong, Low Jho, Jynwell Capital Ltd., Tanore Finance Corporation, Davide Nahmad and all other potential claimants as to the default defendants. Attached to the Kucera Dec. as Exhibit "O" is a true and correct copy of the Default by Clerk. *Id.* at ¶ 16.

Plaintiff has not received a filed claim or answer from

potential claimants Loong, Jho, Jynwel, Tanore, Nahmad or any other potential claimant with respect to the default defendant assets. *Id.* at ¶ 17.

On information and belief, known potential claimants Loong, Jho and Nahmad (the claimants against whom default is sought who are natural persons) are neither minors nor incompetent persons. *Id.* at ¶ 18.

On information and belief, known potential claimants Loong, Jho and Nahmad do not serve in the U.S. Military; accordingly, the Servicemembers Civil Relief Act of 2003 does not apply. *Id.* at ¶ 19.

## II. ARGUMENT

### A. THE STANDARD FOR ENTRY OF JUDGMENT BY DEFAULT

#### 1. THE EITEL FACTORS

After the Clerk has entered default for failure to plead or otherwise defend an action, the court may enter judgment by default on the plaintiff's complaint. Fed. R. Civ. P. 55(a), 55(b)(2). Default judgments "are more often granted then denied." *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999). When exercising this discretion, courts typically consider the following factors:

(1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir.1986) (the "*Eitel* factors"). Furthermore, when considering whether to

grant default judgment, courts generally assume the factual allegations of the complaint to be true. *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-918 (9th Cir. 1987).

The *Eitel* factors weigh heavily in support of default judgment here. The government will be highly prejudiced if default judgment is not granted, because "it would be forced to continue the litigation even though no party has filed an answer or a claim." *United States v. Approximately $194,752 in U.S. Currency*, Slip Copy, 2011 WL 3652509, *3 (N.D. Cal. Aug. 19, 2011). Additionally, as discussed in detail below, the government has established that the defendant assets are property that constitute, or was derived from, proceeds traceable to one or more violations of: (i) a foreign offense involving the misappropriation of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); (iii) wire fraud (18 U.S.C. § 1343); and/or (iv) international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314), and receipt of stolen money (18 U.S.C. § 2315), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), (B)(iv) and (D), and a conspiracy to commit such offenses (hereinafter collectively referred to as the "underlying offenses"). Accordingly, the forfeiture claim has substantive merit and the complaint is sufficient to establish that all of the defendant assets are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

The allegations of the FAC also establish that the defendant assets were involved in, or are traceable to property involved in,

one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i), and a conspiracy to commit such offenses, in violation of § 18 U.S.C. § 1956(h). Specifically, the defendant assets were involved in or are traceable to property involved in one or more financial transactions, attempted transactions, or a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of the underlying offenses, and were designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the underlying offenses, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Accordingly, the forfeiture claims have substantive merit and the FAC is sufficient to establish that all of the defendant assets are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

Furthermore, there is no dispute as to the material facts, because no claimant has filed a valid claim or answer in this case that has not been resolved, and there is no reason to believe that the default of the potential claimants is due to excusable neglect. Finally, while policy considerations favor a decision on the merits, it is not possible to decide this case on the merits with respect to the default defendant assets because no potential claimant has come forward to contest their forfeiture. Therefore, default judgment is appropriate. *Id.*

2. PROCEDURAL REQUIREMENTS

A party seeking default judgment must establish: (a) when and against what party the default was entered; (b) the identification of the pleading to which default was entered; (c) whether the defaulting party is an infant or incompetent person and if so, whether that person is represented by a general guardian, committee, conservator

or other representative; (d) that the Servicemembers Civil Relief Act (50 App. U.S.C. § 521) does not apply; and (e) that notice has been served on the defaulting party, if required by Federal Rule of Civil Procedure 55(b)(2). L.R. 55. As set forth above, these procedural requirements have been met.

3. FAILURE TO FILE A VALID CLAIM AND ANSWER

In order to contest a forfeiture action, a claimant must have Article III and statutory standing. *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1148 (9th Cir. 1989); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273 & n. 3 (10th Cir. 2008); and *United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 497 (6th Cir. 1998). A verified claim is a prerequisite to establishing statutory standing. *United States v. 2007 Chrysler 300 Touring,* Slip Copy, 2011 WL 1119701, (D.N.M. Mar. 10, 20177) (citing *U.S. v. $11,918.00*, 2007 WL 3037307 (E.D. Cal. Oct. 17, 2007)).

The known potential claimants were specifically informed by the government of the requirement to file a claim on or before October 6, 2016, and an answer within 21 days thereafter, either directly, through their attorneys, or both. Based on the delivery date of the latest received request of December 19, 2016, the known potential claimants that are based in Switzerland were informed by the government through an MLAT request to the Central Authority of Switzerland of the requirement to file a claim on or before January 23, 2017, and an answer within 21 days thereafter. Therefore, the known potential claimants are in default, and the facts of the complaint should be deemed admitted.

### B. THE FACTS DEEMED ADMITTED BY THE FAILURE TO FILE A CLAIM OR ANSWER ESTABLISH THAT THE DEFAULT DEFENDANT ASSETS ARE FORFEITABLE

The government alleged the following facts in the FAC with respect to the default defendant assets. Special agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") received information regarding an international conspiracy to launder money misappropriated from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly-owned by the government of Malaysia. Over the course of an approximately four-year period, between 2009 and at least 2013, multiple individuals conspired to fraudulently divert billions of dollars from 1MDB through various means, including defrauding foreign banks and sending foreign wire communications in furtherance of the scheme, and thereafter laundering the proceeds of that criminal conduct. The funds diverted from 1MDB were used for the personal benefit of the co-conspirators and their relatives and associates, including acquiring more that $200 million in artwork that included the Van Gogh and Monet's SGM. Those funds were also used to acquire another artwork that was subsequently sold, generating the defendant Euros.

1. <u>The Van Gogh</u>

Jho used 1MDB funds traceable to the Tanore Phase in 2013[3] to acquire the Van Gogh. *See* FAC at ¶ 435. Tanore successfully bid on the Van Gogh at a November 5, 2013, Christie's auction, for a purchase price of $5,485,000. After Tanore was unable to make payments for the artwork, Tan informed Christie's that Jho would be

---

[3] The "Tanore Phase" is described at paragraphs 227-290 of the FAC.

purchasing the artwork instead. Christie's issued Jho an invoice for $5,485,000 on December 20, 2013. *Id.* at ¶ 436.

Jho purchased the Van Gogh using funds diverted from the 2013 bond sale. On or about March 25, 2013, a wire of $378,000,000 was sent from the Tanore Account to the Granton Account at Falcon Bank in Singapore. On or about that same day, a wire of $378,000,000 was sent from the Granton Account to the Dragon Market Account. On November 5 and 6, 2013, two additional wires totaling $140,500,000 were sent from the Granton Account to the Dragon Market Account. In total $518,500,000 was transferred from the Granton Account to the Dragon Market Account between March 25, 2013 and November 6, 2013. *Id.* at ¶ 437.

Between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account. This included a wire in the amount of $9,800,000 on or about September 10, 2013. Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account.[4] That same day, $9,300,000 was sent from the ADKMIC BSI Account to Jho's personal account at BSI Bank in Singapore. *Id.* at ¶ 438.

Jho also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account. On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account[5], which, on the same

---

[4] The ADKMIC BSI Account is described at paragraph 109 of the FAC.

[5] The LHP Account is described at paragraph 346 of the FAC.

day, transferred $235,500,000 to Jho's personal bank account at BSI Bank in Singapore. *Id.* at ¶ 439.

On or about December 20, 2013, a wire of $7,288,667 was sent from the Jho BSI Account to Christie's bank account at J.P. Morgan Chase in the United States. A second wire of $5,120,000 was sent on or about January 22, 2014, to the same Christie's account. The payment details for that wire read: "NOTES: NOV 2013 AUCTIONS: VAN GOGH (2ND PAYMENT USD1,583,333.00) AND BASQUIAT (2ND PAYMENT USD3,533,333.33.)." A third wire of $5,117,000 was sent from the Jho BSI Account to Christie's on or about February 5, 2014, with the payment details: "NOTES: FINAL PAYMENT FOR AUCTION 2013 (VAN GOGH AND BASQUIAT.)." *Id.* at ¶ 440.

A Christie's invoice for the Van Gogh, marked "PAID," reflects that Jho paid $5,485,000 for the Van Gogh. *Id.* at ¶ 441.

On March 13, 2014, Jho sent an email to an employee at SNS Fine Art (the "SNS Employee"), an art dealer, inquiring: "Do you know of any banks, financiers who take art as security for raise bank loans for investments/acquisitions of more artwork?" Later that same day, Jho explained further in another email to the SNS Employee which read in relevant part, "Just looking to borrow based on asset value. . . Abt usd 330m, so looking for 50%. Only would like facility for 6 months to a year, so I free up cash . . . Can you let me know who can do it? And the top 2 or 3 that would be v aggressive." *Id.* at ¶ 442.

That same day, the SNS Employee responded to Jho, stating in relevant part, "I think those sort of numbers would scare off Sotheby's . . ." and suggested that Jho consider other financial institutions. Jho responded in an email, "Yes pls. Prefer the

boutique banks that can move fast vs the large ones like JPM." In another email dated March 13, 2014, Jho explained to the SNS Employee what types of lenders he would be looking to utilize. Specifically, Jho requested that the SNS Employee look for "Quick, fast and aggressive and ones you know v well. Out of Europe or usa or middle east not asia. Have abt usd350m and looking for line of 50% so I can buy more." *Id.* at ¶ 443.

In discussing the issue of using artworks as collateral to obtain funding from a creditor, Jho sent another email to the SNS Employee on March 14, 2014, explaining that the lender "can take all the art no problems. All in Geneva free port. Speed is the most important and one with a fairly quick and relaxed kyc process. Thanks!" *Id.* at ¶ 444.

In April 2014, Jho used several pieces of art, including the Van Gogh, to secure a loan from Sotheby's Financial Services, Inc. ("Sotheby's Financial"), a Sotheby's affiliate. The loan, with a principal amount of $107 million, was obtained by Triple Eight Ltd., a Cayman Island entity wholly-owned by Jho. Jho secured the loan by pledging to Sotheby's, as collateral, all right and title to 17 pieces of art, which the April 14, 2014 Loan Agreement estimated to be worth between $191.6 and $258.3 million. The list of art used as collateral to secure the loan included the Van Gogh, as well as several works originally purchased by Tanore in May and June 2012 and "gifted" to Jho in October 2013, as described in Section IV.E of the complaint. *Id.* at ¶ 445.

Disbursement records show that Sotheby's Financial disbursed $105,188,721.95 to an account at Caledonia Bank Ltd. in the Cayman

Islands held in the name of Triple Eight Ltd. on or about April 10, 2014. *Id* at ¶ 446.

After disbursing the loan amount to Jho, Sotheby's sold some of the paintings that Jho had pledged as collateral for the loan at Jho's direction. By May 2016, Sotheby's had recovered sufficient funds from the proceeds of the sale of certain pledged art, including the painting "Dustheads," to cover the outstanding balance of the loan. Upon repayment of the loan, Sotheby's released its security interest in the artwork. As of June 7, 2016, Sotheby's still had the Van Gogh in its possession. *Id*. at ¶ 447.

2. Monet's SGM

Jho used 1MDB funds traceable to the Tanore Phase in 2013 to acquire Monet's SGM. *See Id*. at ¶ 448. On December 18, 2013, Jho purchased Monet's SGM for $35,000.000.00 from SNS Fine Arts (SNS"). *Id.* at ¶ 449. SNS issued Jho an invoice for Monet's SGM stating that Jho owed SNS an initial down payment of $5,000,000.00 on or before December 25, 2013. The remaining $30,000,000.00 was due on or before January 31, 2014. *Id.* at ¶ 450.

On December 20, 2013, LOW sent an email to the SNS Employee asking, "Wld you be kind enough to send me an image of this artwork so I can show my family? Thank you." *Id.* at ¶ 451.

On December 22, 2013, the SNS Employee sent an email to Jho stating in pertinent part, "Dear Jho, Congratulations on acquiring Monet's stunning 'Saint-Georges Majeur' . . . which, as you know, once belonged to the Art Institute of Chicago and is also on the cover of Phillipe Piguet's book, 'Monet et Venise.'" *Id.* at ¶ 452.

On March 25, 2013, Jho, using funds diverted from the 2013 bond sale, sent a wire in the amount of $378,000,000 from the Tanore

Account to the Granton Account On March 25, 2013 and November 6, 2013, three wires totaling $518,500,000 were sent from the Granton Account to the Dragon Market Account. *Id.* at ¶ 453.

Between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account. This included a wire in the amount of $9,800,000 on or about September 10, 2013. Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account. That same day, $9,300,000 was sent from the ADKMIC BSI Account to Jho's BSI Account. *Id.* at ¶ 454.

Jho also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account. On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to Jho' s BSI Account. *Id.* at ¶ 455.

On December 23, 2013, a $5,000,000 wire was sent from the LOW BSI Account to SNS Fine Arts' account at J.P. Morgan Chase in connection with the purchase of the SAINT GEORGES PAINTING.

On December 23, 2013, the SNS Employee sent an email to Jho confirming that SNS received the $5 million payment. The subject line of the email read, "Re: Fw: Swift advice on USD 5 mio value 23.12.2013." The email stated in pertinent part, "Dear Jho— I just received notification that the $5M are pending in our account. Congratulations, it's a marvelous painting. I would love to send you a copy of the Monet in Venice book, should I send it to the address of your invoice in HK?" *Id.* at ¶ 457.

On February 5, 2014, a wire for $30,000,000 was sent from Jho's BSI Account to SNS Fine Arts' account at J.P. Morgan Chase. *Id.* at ¶ 458.

On January 28, 2014, the SNS employee sent an email to Jho, reading in relevant part, "Dear Jho, . . . We are currently preparing the crate and shipment for Claude Monet's stunning Venice view 'Saint-Georges Majeur'. Could you kindly confirm the name, address and contact information of where you would like us to arrange to send it please." The following day, Jho responded to the SNS employee and informed him that he would like to have the painting placed in his storage in "Geneva Free Port," in Switzerland. *Id.* at ¶ 459.

Monet's SGM was one of the pieces of art that Jho used as collateral to secure the loan from Sotheby's Financial to Triple Eight in April 2014. After the balance of that loan was paid through the sale of other pledged artwork, Sotheby's released its security interest in Monet's SGM. *Id.* at ¶ 460.

3. <u>The Defendant Euros</u>

The defendant Euros are subject to forfeiture because they are the proceeds of Jho's sale of an artwork acquired with 1MDB funds funneled through the Dragon Market and Dragon Dynasty Account. In 2013, Jho used funds traceable to the Tanore Phase to acquire a 88.5 cm by 100 cm oil on canvas painting by Claude Monet entitled "Nympheas" (the "Petit Nympheas"). *Id*. at ¶ 461.

On June 23, 2014, Jho purchased the Petit Nympheas painting from Sotheby's for £33,829,500 British Pounds ("GBP") (equivalent to approximately $57.5 million). *Id*. at ¶ 462.

On March 25, 2013, the Tanore Account wired $378,000,000 to the Granton Account; and between March 25, 2013 and November 6, 2013,

three wires totaling $518,500,000 were sent from the Granton Account to the Dragon Market Account. *Id*. at ¶ 463.

Between April 25, 2013 and November 8, 2013, four wires totaling $476,300,000 were sent from the Dragon Market Account to the Dragon Dynasty Account. This included a wire in the amount of $9,800,000 on or about September 10, 2013. Three days later, on or about September 13, 2013, a wire of $9,300,000 was sent from the Dragon Dynasty Account to the ADKMIC BSI Account. That same day, $9,300,000 was sent from the ADKMIC BSI Account to the Jho BSI Account. *Id*. at ¶ 464.

Jho also received funds into his personal account at BSI Bank in Singapore indirectly from the Dragon Dynasty Account via his father's account. On or about November 12, 2013, $248,500,000 was wired from the Dragon Dynasty Account to the LHP Account, which, on the same day, transferred $235,500,000 to the JHO BSI Account. *Id*. at ¶ 465.

On July 31, 2014, a wire for £3,183,997 GBP (equivalent to approximately $5.4 million) was sent from the Jho BSI Account to an account maintained by Sotheby's as an initial payment for the Petit Nympheas. *Id*. at ¶ 466.

On October 21, 2014, a wire for $65,000,000 was sent from the Dragon Market Account to the Dragon Dynasty Account. This wire was processed through a U.S. correspondent bank account at J.P. Morgan Chase. *Id*. at ¶ 467.

Two days later, on October 23, 2014, a wire for $65,000,000 was sent from the Dragon Dynasty Account to the Jho BSI Account. That same day, a wire for £28,500,000 GBP (equivalent to approximately $45.7 million) was wired from the Jho BSI Account to Sotheby's in the United Kingdom to acquire the Petit Nympheas. *Id*. at ¶ 468.

On or about March 17, 2015, Jho, Triple Eight, and Sotheby's Financial executed an amendment to the April 2014 loan agreement discussed in Paragraph 445 of the FAC ("Loan Amendment"). Among other things, the Loan Amendment extended the maturity date of the loan, released certain pledged artwork, and added additional artwork as collateral to secure the original loan. The Petit Nympheas was among the works of art that Jho added as collateral in that Loan Amendment. Pursuant to the Loan Amendment, Jho was required to surrender possession of the Petit Nympheas to Sotheby's. After the balance of the loan was paid through the sale of other pledged artwork, Sotheby's released its security interest in the Petit Nympheas. *Id.* at ¶ 469.

On July 15, 2016, an art dealer in Hong Kong ("Hong Kong Art Dealer") paid €26,932,500 into an escrow account at UBS Bank, S.A. in Switzerland to acquire the Petit Nympheas from Jho on behalf of an anonymous third party. The purchase price for the Petit Nympheas was €25,227,025.83 (the defendant Euros). *Id.* at ¶ 470.

On July 19, 2016, the Hong Kong Art Dealer directed that the defendant Euros be transmitted from the escrow account at UBS Bank to Jho's bank account at Banque Federale de Commerce, S.A. in Comoros, through Moroccan Foreign Trade Bank International, S.A., with whom Banque Federale de Commerce had a correspondent bank relationship. *Id.* at ¶ 471.

On July 22, 2016, Moroccan Foreign Trade Bank International, S.A. declined to process the transaction until certain compliance-related facts could be obtained from the escrow agent in Switzerland. When the escrow agent could not provide satisfactory answers to these questions, the defendant Euros were returned to the escrow account at

UBS Bank, where they remain under restraint pending the conclusion of this action. *Id.* at ¶ 472.

**C. THE LEGAL BASES FOR FORFEITURE OF THE DEFAULT DEFENDANT ASSETS**

The default defendant assets are forfeitable on the following grounds.

First, the allegations of the FAC establish that the default defendant assets constitute or are derived from proceeds traceable to one or more of the underlying offenses, or a conspiracy to commit such offenses.

Second, the allegations of the FAC establish that the default defendant assets were involved in or are traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957, and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h). Specifically, the default defendant assets were involved in or are traceable to property involved in one or more financial transactions, attempted transactions, or a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, including the underlying offenses.

Third, the allegations of the FAC establish that the default defendant assets were involved in, or are traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) or a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h). Specifically, the default defendant assets were involved in or are traceable to property involved in one or more financial transactions, attempted

transactions, or a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, including the underlying offenses, which transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Fourth, the allegations of the FAC establish that the default defendant assets were involved in, or are traceable to property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B), or a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h). Specifically, the default defendant assets were involved in or are traceable to funds that were or were attempted to be transported, transmitted or transferred, or a conspiracy to transport, transmit or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activities, including the underlying offenses.

For these reasons, the default defendant assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

To prevail on its claims, the government must establish the elements of the claims by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). In making that showing, the government may rely upon

both circumstantial and direct evidence. *United States v. $291,828.00 In U.S. Currency*, 536 F.3d 1234, 1237 (11th Cir. 2008); *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980 (9th Cir. 2002) (forfeiture determination is based on the aggregate of the facts including circumstantial evidence). The allegations summarized above are sufficient to establish the elements of the government's forfeiture claims.

**D. THE PROPOSED DEFAULT JUDGMENT**

Once a court has decided that judgment should be entered by default, the court must determine the character of the recovery to grant the plaintiff. 10A Wright, Miller & Kane, *Federal Practice and Procedure 3d* § 2688. The proposed default judgment grants the very relief sought in the complaint (forfeiture of the defendant assets).

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court grant this motion for default judgment against the

///

///

default defendant assets (the Van Gogh, Monet's SGM, and the defendant Euros).

Dated: August 30, 2017

Respectfully submitted,

DEBORAH CONNOR
Acting Chief, MLARS

SANDRA R. BROWN
Acting United States Attorney

*/s/John J. Kucera*

JOHN J. KUCERA
JONATHAN GALATZAN
Assistant United States Attorneys

WOO S. LEE
Deputy Chief, MLARS
JONATHAN BAUM
BARBARA LEVY
Trial Attorneys, MLARS

Attorneys for Plaintiff
UNITED STATES OF AMERICA